801 P.2d 646

CALIFORNIA FIRST BANK, Administrator and Personal Representative of the Estate of Laurence Henry McKeen, Shelby McKeen, Kimberly McKeen, all deceased, as Guardian of the person and Estate of Molly Lynn McKeen, a minor, Petitioner,

v.

STATE of New Mexico, Department of Alcohol Beverage Control, Board of Commissioners of the County of McKinley, and the City of Gallup, Respondents.

No. 18752.

Supreme Court of New Mexico.

Nov. 28, 1990.

Carpenter & Goldberg, William H. Carpenter, Joseph Goldberg, Daymon B. Ely, David J. Stout, Albuquerque, for petitioner.

Montgomery & Andrews, Stephen S. Hamilton, Santa Fe, for respondents.

## OPINION

RANSOM, Justice.

California First Bank, as personal representative of the estates of Laurence Henry McKeen, Shelby McKeen, and Kimberly McKeen, and as guardian of Molly Lynn McKeen, filed suit for wrongful death and personal injury against defendants, the New Mexico State Highway Department, the Department of Alcohol Beverage Control (ABC), The Board of Commissioners of the County of McKinley (County), and the City of Gallup (City). The court of appeals reversed a dismissal of the complaint as to the County and affirmed a dismissal as to ABC and the City.[1] We granted certiorari and affirm the court of appeals in part, reverse in part, and remand with instructions.

■ *Standard of review.* As did the court of appeals, in reviewing the dismissal of the complaint for failure to state a claim upon which relief may be granted, *see* SCRA 1986, 1–012(B)(6), we "accept as true all facts well pleaded and question only whether the plaintiff might prevail under any state of facts provable under the claim." *Gomez v. Board of Educ.*, 85 N.M. 708, 710, 516 P.2d 679, 681 (1973).

*The complaint.* It is alleged that, on the evening of July 16 and in the early morning hours of July 17, 1983, employees at Eddie's Bar in Gallup sold alcoholic beverages to Harrison Shorty, a Navajo Indian, knowing that he was an intoxicated person. At some point in the evening, Shorty fired several gun shots outside the bar. Sheriff deputies observed Shorty do this but failed to apprehend or arrest him.

Not long after the shooting incident, Shorty allegedly left Eddie's Bar and drove north on U.S. Road 666. At the intersection of U.S. Road 666 and State Road 264,

Shorty crossed the center line of the highway in his truck and collided with a vehicle driven by Laurence McKeen, who was on vacation with his wife Shelby McKeen and daughters Kimberly and Molly McKeen. Laurence, Shelby, and Kimberly were killed and Molly was seriously injured.

The complaint alleges the Gallup Police Department and its employees were acting in the capacity of agents, servants, or employees of the City, and the Sheriff's Department and its employees were acting as agents, servants, or employees of the County. Although Eddie's Bar and other drinking establishments in Gallup were notorious as "Indian Bars" with drinking excesses, the City and County had articulated a policy not to interfere with the drinking activity inside these establishments and instructed law enforcement officers under their control not to enter bars for the purpose of enforcing the liquor control laws. The City and County also instructed law enforcement officers not to apprehend or arrest persons driving while under the influence of alcohol.

It is further alleged that, in their implementation of the policies promulgated by the City, the Gallup police refused to enforce the liquor control laws so as to prevent Shorty from being served alcohol on the night of the accident or from driving while intoxicated, and that, following these policies and instructions, officers of the Sheriff's Department failed to pursue Shorty into the bar despite knowledge that he posed a threat to the safety of others.

*Issues.* This case requires us once again to consider application of the waiver of sovereign immunity for injury caused by law enforcement officers. The waiver is contained in Section 41–4–12 of the Tort Claims Act, NMSA 1978, Sections 41–4–1 to –27 (Repl.Pamp.1989). The court of appeals determined that defendants were not *directly liable* for the deaths and injuries in this case, because they are not law enforcement officers within the scope of the waiver of immunity. *See Anchondo v. Corrections Dep't*, 100 N.M. 108, 666 P.2d

---

1. The claim against the State Highway Department remains pending in district court.

1255 (1983) (construing meaning of "law enforcement officer"); *Abalos v. Bernalillo County Dist. Attorney's Office,* 105 N.M. 554, 734 P.2d 794 (Ct.App.) (construing meaning of "law enforcement officer"), *cert. quashed,* 106 N.M. 35, 738 P.2d 907 (1987). The court also reasoned that defendants were not directly liable because they owed no duty to the plaintiff to promulgate policies of active enforcement of liquor-control and drunk driving laws. *Cf. Schear v. Board of County Comm'rs,* 101 N.M. 671, 687 P.2d 728 (1984) (duty of police officers to investigate report of ongoing crime).

However, the court further held the County might be *vicariously liable* under "traditional principles of respondeat superior" if plaintiff can prove that the McKinley County Board of County Commissioners "exercised immediate supervisory authority over sheriff's deputies" whose negligence was alleged to have caused a battery. *See Silva v. State,* 106 N.M. 472, 745 P.2d 380 (1987) (immunity waived for governmental entity if it would be vicariously liable for non-immune acts of public employee under traditional notions of respondeat superior); *Methola v. County of Eddy,* 95 N.M. 329, 622 P.2d 234 (1980) (waiver of immunity for battery extends to battery committed by third party when battery was proximately caused by negligence of law enforcement officers).

The court also determined that, in order to fall within the waiver of immunity in Section 41-4-12 for a battery "caused by law enforcement officers," plaintiff must prove that the perpetrator of the alleged battery specifically intended the offensive or harmful touching. *Cf. Cross v. City of Clovis,* 107 N.M. 251, 252-53 n. 1, 755 P.2d 589, 590-91 n. 1 (1988) (expressly reserving judgment on whether battery existed under the facts).

Finally, in response to our request for briefs on specific issues, the parties have addressed whether the complaint alleges a "violation of rights * * * secured under the constitution and laws of the United States or New Mexico" pursuant to the waiver provisions relative to law enforcement officers in Section 41-4-12.

■ *Section 41-4-12 does not provide a waiver of immunity for concurrent torts of all governmental entities when a police officer causes an occurrence for which immunity of a law enforcement agency is waived.* While plaintiff acknowledges that none of the defendants is a "law enforcement officer," it contends that, because of the concurrent negligence of law enforcement officers, Section 41-4-12 provides a waiver of immunity based on defendants' direct liability for promulgating a policy of nonenforcement. Section 41-4-12 is entitled "Liability; law enforcement officers," and provides:

The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

Plaintiff contends in its briefs that this Section does not limit waiver of immunity to any specific governmental entity, e.g., a law enforcement agency, when injury is caused by law enforcement officers. Rather, it is directed to certain types of injury-producing conduct for which liability is waived when "caused by" law enforcement officers. It clearly does not expressly exclude suit against other concurrent governmental tortfeasors. Plaintiff points out that, since the Tort Claims Act is in derogation of the common-law right to sue the government, its provisions are strictly construed. *Methola,* 95 N.M. at 333, 622 P.2d at 238.

Waiver of immunity for all governmental actors whose conduct concurs with that of law enforcement officers to cause injury, defendants contend, conflicts with the plain meaning of Section 41-4-12 and would run counter to the intent of the Legislature to

create well defined limits to governmental liability. *See* § 41–4–2(A) (declaration of public policy); § 41–4–4(A) (governmental entities and public employees acting within scope of duties are immune except as immunity is waived by Sections 41–4–5 to –12). Defendants argue that, simply by tracing the chain of causation to as many governmental actors as possible, a plaintiff could join an indefinite number of defendants as to whom none of the waiver provisions of the Tort Claims Act directly apply.

At oral argument, in response to one of our questions, plaintiff agreed that its theory could be narrowed to include only those governmental actors who concurrently caused *the conduct* for which there is a waiver of immunity, rather than all governmental actors whose conduct concurred to cause *the injury* itself. It is maintained that defendants promulgated a policy of nonenforcement, and, in implementing this policy, conduct of law enforcement officers created a dangerous condition on the public streets and highways in and around Gallup, which condition proximately caused death and injury to the McKeen family.

None of our previous cases have addressed this issue directly.[2] We note, however, that plaintiff's theory runs counter to the court of appeals' opinion in *Abalos,* in which the issue of whether a particular defendant was acting as a law enforcement officer dictated both grant of suit against the director of the Bernalillo County Detention Center and dismissal of suit against employees of the district attorney's office for injury caused by a negligently released prisoner. *Compare Abalos,* 105 N.M. at 560, 734 P.2d at 800 *with id.* at 561, 734 P.2d at 801. We believe *Abalos* was decided correctly.

While in *Methola,* 95 N.M. at 333, 622 P.2d at 238, we held the Section 41–4–12

waiver of immunity for various tortious acts "caused by" law enforcement officers was not limited to acts *committed by* such officers, our focus was on the language of the statute and the particular public employees for whose acts provision was made—law enforcement officers. To interpret Section 41–4–12 to extend its waiver of immunity to any and all governmental actors who caused the injury producing conduct of a law enforcement officer would run counter to the structure of the Act that is quite specific with respect to the employee conduct for which the immunity of an employee and his or her agency is waived. Had the Legislature intended to waive immunity for all governmental entities whose conduct concurrently caused the non-immune act of a law enforcement officer, we believe it would have enacted clear provisions to effect that intent.

Although we strictly construe the provisions of the Tort Claims Act, our primary purpose remains to determine the Legislature's intent. *See Methola,* 95 N.M. at 333, 622 P.2d at 238. To this end, we look first to the language used and we read the Act as a whole to give effect to its parts. *Id.* We conclude plaintiff has failed to state a direct cause of action against ABC, the County, or the City, for which governmental immunity has been waived, and thus we affirm the result reached by the court of appeals. Given our resolution of this issue, we do not reach the question of whether defendants owed a duty of care to the McKeens that was breached by the conduct alleged in the complaint.

■ *County may be vicariously liable if sheriff deputies, in failing to take reasonable steps to investigate a disturbance, were acting under the actual control of the County in implementing a County*

---

2. In *Anchondo,* 100 N.M. at 111, 666 P.2d at 1258, we held simply that the Secretary of Corrections and the Warden of the State Penitentiary were not "law enforcement officers" within the definition set out in Section 41–4–3(D). However, *Anchondo* does not address whether Section 41–4–12 waives immunity only against defendants who are "law enforcement officers" within the meaning of Section 41–4–3(D). *See also Methola,* 95 N.M. at 332, 622 P.2d at 237

(sheriff, deputies, and jailers at county jail all were law enforcement officers within meaning of statute); *Abalos,* 105 N.M. at 560, 734 P.2d at 800 (director of county detention center was a law enforcement officer). Although the Bernalillo County Board of County Commissioners was a defendant in *Schear,* the County did not raise the issue of whether it was immune from suit.

*policy of nonenforcement of liquor-control and drunk driving laws.* The court of appeals held that the County may be vicariously liable for actions of sheriff deputies if plaintiff shows the County exercised "direct supervisory authority," including the right to control details as to the manner of the deputies' work. The court noted that while NMSA 1978, Section 4–41–6 (Repl.Pamp.1984) authorizes counties to establish "a merit system for the hiring, promotion, discharge and general regulation of the deputies and the employees of the county sheriff's office," it does not give a County the authority to control the details of a sheriff deputy's work. *See Romero v. Shelton*, 70 N.M. 425, 374 P.2d 301 (1962) (an agent becomes the servant of the principal, who then becomes subject to vicarious liability as the master, when the principal has the right to control agent's physical actions), *overruled on other grounds, Archuleta v. Pina*, 86 N.M. 94, 519 P.2d 1175 (1974); *see generally Restatement (Second) of Agency* § 250 (1958). Nevertheless, the court concluded, the allegation in the complaint that the sheriff deputies were acting as "agents, servants, or employees of the McKinley County" precluded judgment on the pleadings in favor of the County and entitled plaintiff "to prove the requisites for application of the doctrine of respondeat superior."

Plaintiff contends the court of appeals too narrowly has construed the scope of the County's vicarious liability. We agree. Applying traditional principles of respondeat superior here, we conclude the court of appeals erred insofar as its opinion may be construed to imply that "direct supervision" and "the right to control" are essential criteria for determining whether the County is vicariously liable in this case. Although the right to control, regardless of whether exercised, may establish the existence of vicarious liability based on a master-servant relationship, *see Silva v. State*, 106 N.M. 472, 477, 745 P.2d 380, 385 (1987), we read the complaint in this case to allege a degree of actual, de facto control which, if proven, also would establish the County's vicarious liability.

As noted by the court of appeals, the *Restatement (Second) of Agency* provides that "[a] servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." *Restatement (Second) of Agency* § 220(1), at 485 (1958). *See McCauley v. Ray*, 80 N.M. 171, 180, 453 P.2d 192, 201 (1968) (verdict against corporation under theory of respondeat superior supported by substantial evidence showing that, at time he shot plaintiff, defendant husband was the servant of corporation and performed services with the knowledge and consent of his wife, who was the president of the corporation, and was under her control *or* subject to her right of control); *see also Slagle v. United States*, 612 F.2d 1157 (9th Cir.1980) (for purposes of federal tort claims act, drug informant was not employee of federal government during gun battle with narcotics dealers in which third party was injured; contract with informant did not give government right to control details of informant's activity, *and* government had not exercised actual control on the day in question); *Kenai Peninsula Borough v. State*, 532 P.2d 1019 (Alaska 1975) (state was not vicariously liable for the acts of a school bus driver employed by the borough because *neither* did the state exercise actual control over borough's provision of transportation services *nor* did statute or contract between borough and state authorize the borough to employ driver on behalf of the state); *see generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 70, at 501 (5th ed. 1984) [hereinafter *Prosser*] (servant is person employed to perform services in the affairs of another, whose physical conduct in the performance of the service is controlled, *or* is subject to a right of control, by the other).

█ Although a master's exercise of control or the right of control typically arises under a contract for employment, a master-servant relationship does not depend on the existence of a contractual relationship. *See Restatement (Second) of Agency* § 225

comment a (1958); 2 F. Mechem, *A Treatise on the Law of Agency* § 1859 (2d ed. 1914) [hereinafter *Mechem*]. A master-servant relationship also may exist when one person volunteers to perform services for another, or when such services are performed under duress. *Restatement (Second) of Agency* §§ 224, 225 (1958); *see McCauley,* 80 N.M. at 180, 453 P.2d at 201 (fact that individual's services may have been rendered gratuitously did not preclude finding that he was servant of corporation); *see also Kenai Peninsula Borough,* 532 P.2d at 1025 (citing *Restatement (Second) of Agency* Sections 224, 225); *Swearinger v. Fall River Joint Unified Sch. Dist.,* 166 Cal.App.3d 335, 212 Cal. Rptr. 400 (1985) (reversing summary judgment in favor of defendant school district because of material issue of fact whether student driver who volunteered to act as host to visiting students during basketball tournament was an employee of defendant under traditional concepts of respondeat superior). *See generally Mechem* § 1859; W. Seavey, *Handbook on the Law of Agency* § 84M (1964). *Cf. United States v. West,* 453 F.2d 1351, 1356 (3d Cir.1972) (citing the *Restatement (Second) of Agency* Section 224, court noted that illegal acts of private citizen in conducting a search may be attributable to police for fourth amendment purposes when citizen was acting as the agent of the police and within the scope of his instructions, even though the agency relationship was undertaken voluntarily or was induced by duress).

■ The individual to be held vicariously liable as the master must, however, act in such a manner that reasonably may be interpreted as indicating a willingness that the other perform such services. *Restatement (Second) of Agency* § 225 comment c (1958); *see also Scottsdale Jaycees v. Superior Court,* 17 Ariz.App. 571, 499 P.2d 185 (1972). In such cases, the master may or may not have a legal right to control the actions of the servant, and the vicarious liability of the master will turn instead on whether another has submitted to the master's actual control in rendering services, either voluntarily or under duress.

■ Here, the County may not have possessed statutory authority or a contractual right to control the details of a sheriff deputy's performance of his or her job. Nonetheless, the complaint reasonably may be read to allege that the deputies acted as servants of the County in the specific matter of enforcement of certain laws because the deputies were implementing an express County policy voluntarily or under some form of duress or compulsion. These allegations extend beyond the claim that a casually articulated desire on the part of the County was implemented unilaterally by sheriff deputies against the County's true wishes. Rather, the complaint details specific instructions by the County not to enforce particular laws. Additionally, the County allegedly failed to train, supervise, or discipline officers regarding the enforcement of these laws. This failure reasonably may be seen as indicating the County's acceptance of the practice allegedly observed by sheriff deputies in implementing what they thought was County policy.

We conclude that the complaint may be read to allege conduct by the County from which the sheriff deputies could reasonably infer the acceptance of "service" rendered by them and a desire that they act precisely as they were alleged to have acted in failing to investigate the disturbance at Eddie's Bar. *Cf. Biedenbach v. Teague,* 194 Pa.Super. 245, 166 A.2d 320, 323–24 (1960) (friend who volunteered to get car for defendant reasonably believed he was acting to the benefit of the defendant and that defendant authorized such service in light of the course of their past dealings with regard to the car). Under traditional principles of respondeat superior as articulated in this opinion, plaintiff has alleged that the sheriff deputies were acting as servants of the County independent of any allegation that the County exercised direct supervisory control.

■ *Plaintiff has alleged a violation of a right secured under New Mexico law.* In response to one of the questions we asked the parties to brief, plaintiff advanced the argument that failure to enforce liquor-control and drunk driving laws

deprived McKeens of a right secured by NMSA 1978, Section 29–1–1 (Repl.Pamp. 1990), which declares it "to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware * * * * " We do not reach plaintiff's argument insofar as it contends that Section 29–1–1 creates primary liability on the part of the defendants, as we already have concluded Section 41–4–12 does not waive immunity for claims based on their primary liability.[3] Insofar as plaintiff's argument addresses the vicarious liability of the County for the acts of its sheriff deputies, we hold that plaintiff has alleged a cause of action based on violation of a right secured by the laws of New Mexico.[4]

*—Section 41–4–12 provides for a waiver of immunity when a law enforcement officer has caused the deprivation of a right secured under New Mexico statutory law.* Section 41–4–12 waives liability when the plaintiff's injury arose from the "deprivation of any rights * * * secured by the

constitution and laws of the United States or New Mexico * * * * * " In determining the scope of this waiver, we consider, first, the meaning of the term "laws" and, second, the significance of the use of the conjunctive "and" in the phrase "constitution and laws."

Generally, there exist three sources of "laws" that may secure a right of an individual—the common law, positive law enacted by the Legislature, and constitutional law. *See generally Black's Law Dictionary* 795–96 (5th ed. 1979). We eliminate the federal and state constitutions as sources of "laws" as that term is used in Section 41–4–12, since the statute lists these constitutions separately. Similarly, although not at issue in this case, it may be that the Legislature also intended to exclude the common law as a source of "laws," since the provisions of Section 41–4–12 under consideration are preceded by a list of specific common-law causes of action for which immunity has been waived, e.g., assault, battery, false imprisonment. *Cf. Cross*, 107 N.M. at 252–53 n. 1, 755 P.2d at 590–91 n. 1 (refusing to address whether

---

3. The court of appeals devotes much of its opinion to a discussion of defendants' primary liability for promulgating a policy of nonenforcement in terms of a distinction between "active" and "passive" enforcement of the law. The court suggests that "full enforcement statutes" such as Section 29–1–1 create only a duty of "passive enforcement," that is, a duty to investigate particular crimes brought to the attention of police officers, as happened in *Schear*. A duty requiring specific allocation of resources to ferret out crime, the court suggested, would create an intolerable interference with the executive's discretion to allocate scarce resources. Our conclusion that defendants were not "law enforcement officers" allows us to avoid deciding whether a cause of action may be stated for promulgation of a policy of nonenforcement of liquor-control and drunk driving laws.

We entertain, however, grave misgivings concerning the rationale articulated by the court of appeals. First, we believe the court mischaracterized the allegations in the complaint, the gist of which are that defendants created a policy directing law enforcement officers to refrain from even *passive enforcement* of certain laws. More importantly, however, we disapprove of the court of appeals' reliance on a theory that, in substance, conflicts with Section 41–4–2(B) in that it resurrects a form of common-law sovereign immunity for policy making activities.

That Section abolishes judicially created categories such as "governmental functions-proprietary functions" and "discretionary acts-ministerial acts" in favor of limited liability (under specific waiver provisions) based on common-law concepts of duty and the reasonably prudent person. In *Schear*, it was on this statutory language that we based our refusal to apply the "public duty-special duty" rule. 101 N.M. at 672–75, 687 P.2d at 729–31. We see little difference in principle between the rule rejected in *Schear* and the "active enforcement-passive enforcement" distinction used by the court of appeals in the present case.

4. Although the complaint contains allegations that otherwise would establish the vicarious liability of the City for the acts of City police officers, we believe the complaint fails to allege a cause of action. The complaint against City police is based on the generalized failure of unnamed City police officers to enforce liquor-control and drunk driving laws on unspecified past occasions, or to apprehend Shorty after he elected to drive. There is no allegation that officers had specific knowledge of Shorty's condition or the danger he posed to the community. Absent such specific knowledge of an intoxicated driver, we believe the causal connection between an officer's past acts and omissions and the accident in this case is too tenuous a basis upon which to fix liability.

complaint alleged the deprivation of a common-law right that was "secured" by the "laws of New Mexico"). In any event, we conclude that the term "laws" refers *at least* to legislative enactments.

The use of the conjunctive "and" may arguably require that a plaintiff's injury arise from violation of a right secured by *both* "the constitution and laws." Although such a construction may seem to comport with the literal sense of the terms used, it has been noted that "the popular use of 'or' and 'and' is so loose and so frequently inaccurate that it has infected statutory enactments." *State ex rel. Board of Comm'rs v. Bergeron*, 235 La. 879, 898, 106 So.2d 295, 302 (1958). Moreover, as this Court has recognized, the word "and" sometimes may be used to mean "as well as." *Davis v. Savage*, 50 N.M. 30, 49, 168 P.2d 851, 863 (1946) (word "and" in mortgage provision that authorized mortgagee to take possession of real estate upon default *and* sell it at public auction did not preclude mortgagee from taking possession of real estate for a purpose other than to sell it).

We will not blindly apply a conjunctive meaning to "and," or a disjunctive meaning to "or," when the context of the statute demands otherwise. *See Public Serv. Co. v. New Mexico Pub. Serv. Comm'n*, 106 N.M. 622, 624, 747 P.2d 917, 919 (1987) (the word "or" is given a disjunctive meaning unless context of the statute demands otherwise). Although we do not treat these terms as interchangeable, we note that their strict sense is more readily departed from than that of other words. Here, we do not believe the word "and" was intended by the Legislature to limit the scope of the waiver of immunity to only those rights secured by both the constitution and by statutory enactment.

We note that the clause in question is modelled on language in 42 U.S.C. Section 1983—this Section provides that "[e]very person who, under color of [state law, subjects another] to the deprivation of any rights * * * secured by the Constitution and laws [of the United States], shall be liable to the party injured * * * *" *See*

*DeVargas v. State ex rel. New Mexico Dep't of Corrections*, 97 N.M. 447, 451, 640 P.2d 1327, 1331 (Ct.App.1981) (liability under Section 41–4–12 provision for violation of rights secured by the constitution and laws of the United States is consistent with liability under Section 1983), *cert. quashed by opinion*, 97 N.M. 563, 642 P.2d 166 (1982). The Supreme Court consistently has interpreted the phrase "and laws" in Section 1983 to provide for a cause of action for violations of rights created solely by federal statute. *See, e.g., Wright v. City of Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (Section 1983 provided for suit based on federal right secured by Brooke Amendment to the Housing Act of 1937); *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (no federal right created by Developmentally Disabled Assistance and Bill of Rights Act on which to base Section 1983 suit); *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (Section 1988 provided for award of attorney fees in Section 1983 suit challenging state's interpretation of federal legislation providing aid to families with dependent children); *Edelman v. Jordan*, 415 U.S. 651, 675, 94 S.Ct. 1347, 1361–62, 39 L.Ed.2d 662 (1974) (suits in federal court under Section 1983 are proper to secure compliance with the provisions of the Social Security Act on the part of participating states).

Although the federal cases are not binding on this Court, we find the Supreme Court's application of Section 1983 to rights secured by federal statute of considerable value given the similarity in the language and purpose of Section 1983 to the provisions in Section 41–4–12 under consideration. Moreover, we are sensitive to the fact that, as under federal law, many important state rights are secured either by the state constitution or by statute, but not by both. A restrictive construction of Section 41–4–12 based on the use of the word "and" would lend to the statute an obscure meaning since we can not imagine the Legislature could have had in mind any given rights secured by both "the constitution and laws of * * * New Mexico." We

believe it evident that Section 41–4–12 waives immunity for injury resulting from a violation of a right secured only under the New Mexico Constitution. To read Section 41–4–12 to require that a state right be secured by *both* the state constitution and by a separate state statute would defeat this intent.[5] We therefore conclude that the addition of the phrase "and laws" was meant to expand the set of rights upon which the state could be sued to include rights created by statute.

We will not read into a statute language that it does not contain. Our goal is to divine the Legislature's intent in terms of the entire statute. *State ex rel. Klineline v. Blackhurst,* 106 N.M. 732, 749 P.2d 1111 (1988). Applying these principles here in light of federal precedent on the analogous provisions of Section 1983, we conclude that Section 41–4–12 of the Tort Claims Act waives immunity when injury has resulted from a deprivation of any right secured by the statutory law of the United States or New Mexico as well as any right secured by the federal or state constitution, "if caused by a law enforcement officer."

*—Section 29–1–1 secures a right under New Mexico law that provides a basis for a cause of action against the state.* In *Methola* we held that the custodial relationship between a jailer and an inmate supported a common-law duty of care upon which an injured inmate could base a negligence claim for the jailer's alleged failure to prevent other inmates from committing a battery. 95 N.M. at 333, 622 P.2d at 238. We took note of *Methola* in *Schear* when we rejected the "public duty-private duty" rule and held that Section 29–1–1 created a duty that supported a cause of action in negligence against law enforcement officers who failed to investigate a reported assault in progress. 101 N.M. at 677, 687 P.2d at 734. As a result of this failure to investigate, the plaintiff in *Schear* had been raped and tortured by an intruder. *Id.* at 672, 687 P.2d at 729.

■ Because the injury in *Schear* undoubtedly resulted from a battery, we did not reach the question of whether Section 29–1–1 secured a right under New Mexico law for the violation of which Section 41–4–12 provides an independent waiver of immunity. The allegations concerning the traffic accident in this case do not necessarily constitute a battery,[6] and thus the issue

5. Alternatively, the phrase "and laws" would be surplusage if taken to refer to Section 41–4–12 itself, since the statute would have the same meaning if it stated simply that immunity was waived for violations of rights secured by the New Mexico Constitution. In interpreting a statute, we must avoid if possible a construction that renders part of the statute surplusage. *T.W.I.W., Inc. v. Rhudy,* 96 N.M. 354, 630 P.2d 753 (1981).

6. Although we do not reach this issue given our holding regarding a violation of a right secured under New Mexico law, we note the court of appeals held that, to establish his acts constituted a battery, plaintiff must show Shorty intended to cause contact. We agree with this statement. However, we find misleading the court's further statement in remanding this issue for further proceedings that "intoxication is [not] necessarily inconsistent with an intent to cause offensive contact." We believe Shorty's intoxication would be material to a jury determination of whether a battery was committed in this case. Liability for battery no longer is restricted to acts that are the "direct application of force." *Sanford v. Presto Mfg. Co.,* 92 N.M. 746, 747, 594 P.2d 1202, 1203 (Ct.App.1979). Nor is the "intent" required under tort law a malicious intent to cause harm or even a desire to bring about a particular set of consequences. *See Spivey v. Battaglia,* 258 So.2d 815 (Fla.1972). As acknowledged by the court of appeals, the term "intent" also denotes "that the actor believes that the consequences are substantially certain to result from [the action taken]." *See Restatement (Second) of Torts* § 8A (1965).

We believe that under some facts a jury might infer injury or death to have been the "substantially certain outcome" of an intoxicated individual's decision to operate a motor vehicle on a public highway. When evidence exists to support such a conclusion, contrary evidence of the intoxicated driver's lack of subjective appreciation of the magnitude or nature of the risk created is not controlling, and the jury may infer the existence of such an appreciation even in the face of testimony to the contrary. While there is no presumption that the actor intended the consequences of his conduct, "[t]he factfinder need not credit the actor's assertion that the actor did not intend the result in question * * * *" *Prosser* § 8, at 36. *Cf. Jenkins v. Averett,* 424 F.2d 1228 (4th Cir.1970) (when police officer's initial decision to use armed force was not justified or excused, he committed a battery by accidentally pulling trigger of gun while lowering barrel and shooting the plaintiff in the leg

of whether Section 29–1–1 secures such a right is squarely presented. In deciding this question we note that federal courts use a two-prong test to determine whether a statute secures a right under Section 1983: (1) whether the legislation creates a right on the part of specific individuals; and (2) whether the legislative remedy explicitly or implicitly forecloses enforcement by private individuals through resort to Section 1983. *See* 1 I. Bodensteiner & R. Levinson, *State & Local Government Civil Rights Liability* § 1:16 (1987). While we again emphasize that federal precedent does not necessarily control our analysis of state law, we believe this basic test provides a reasonable means to determine whether a state statute secures a right under Section 41–4–12.

*Schear* establishes that Section 29–1–1 created a duty that accrues to the benefit of specific individuals—i.e., that it creates an individual right.[7] The question to be answered, therefore, is whether the remedies provided by Section 29–1–1 explicitly or implicitly preclude a private cause of action under the Tort Claims Act when a law enforcement officer's negligent failure to discharge his legal duty results in personal injury. Section 29–1–1 contains no explicit limitation precluding tort liability,

however, it does provide that violations are punishable by fine and removal from office of an offender. We do not believe these remedies preclude tort liability under the Tort Claims Act.

These remedies of punishment by fine and removal from office are not of such a comprehensive nature and scope that they would be frustrated by imposition of tort liability under the waiver provisions of Section 41–4–12. *Compare Middlesex County Sewerage Auth. v. National Sea Clammers Assoc.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (comprehensive nature of federal Water Pollution Control Act and Marine Protection, Research and Sanctuary Act indicated congressional intent to foreclose private enforcement of these statutes by means of Section 1983) *with Wright*, 479 U.S. at 425, 107 S.Ct. at 771 (provisions in federal Housing Act allowing federal agency to penalize violators was not of such a nature as to indicate Congressional intent to foreclose resort to Section 1983 by private individuals for violations of rights secured under Act). Indeed, allowing personal injury actions under the Tort Claims Act against the governmental entities employing law enforcement officers encourages the development of better training and supervision programs, rather than sim-

after the plaintiff had obeyed the officer's command to halt); *Kaczer v. Marrero*, 324 So.2d 717 (Fla.Dist.Ct.App.1976) (unnecessary to show "subjective fault" or "intent to injure" on the part of an insane assailant who stabbed plaintiff if a reasonable person, standing in the assailant's shoes, would realize that harm was a substantially certain outcome of his actions).

Nor do we regard it as crucial whether an intoxicated individual's conscious decision to drive put a particular, known person at risk. *See Brown v. Martinez*, 68 N.M. 271, 281–82, 361 P.2d 152, 159–60 (1961) (it was immaterial whether the defendant intended harmful or offensive contact to the plaintiff, or even whether he knew plaintiff to be in the vicinity, when he shot a high-powered rifle to frighten off trespassers who were stealing watermelons). The decision to drive under the circumstances described above constitutes an intent to engage in unlawful conduct that invades the protected interests of others, and this intent provides sufficient grounds to treat the conduct as an intentional tort. In such cases, we think the better rule is that stated in *Keel v. Hainline*, 331 P.2d 397, 399 (Okla.1958): "[When] the basis of an action is assault and battery, the intention with

which the injury was done is immaterial * * * provided the [intentional] act causing the injury was wrongful * * * *" *See also* 6A C.J.S. *Assault and Battery* § 9 (1975) (when defendant otherwise engaged in a trespass or unlawful transaction at the time of the alleged battery that was likely to injure another, the intent to commit the unlawful act provides a sufficient basis upon which to find a battery).

**7.** It may be argued that in *Schear* the identity of the victim was known to the police, whereas here the sheriff deputies knew only the identity of the person who was violating the law and did not have specific knowledge of the McKeen family. This distinction is not dispositive of the existence of a right on the part of the McKeen family. *Schear* held that Section 29–1–1 created a duty on the part of law enforcement officers and allowed the imposition of liability for injury proximately caused by negligent breach of that duty. Extension of that duty to the McKeen family rested upon the foreseeability of a risk of injury to the traveling public in the event sheriff deputies failed to apprehend Shorty after they knew of his dangerously intoxicated condition.

ply imposing cumulative punishment on the officers themselves. Absent some clear indication of a contrary legislative intent, we are loathe to exclude violations of the right secured by Section 29–1–1 from the ambit of the waiver of immunity in Section 41–4–12, particularly since such a waiver is consistent with the legislative declaration of public policy regarding the compensation of victims of governmental torts. *See* § 41–4–2(A) (declaration of policy).

■ We hold that the allegations in the complaint that sheriff deputies failed to apprehend Shorty or investigate the disturbance at Eddie's Bar, and that this failure proximately caused personal injury to the McKeen family, suffice to state a cause of action for negligent violation of a right secured under New Mexico law for which Section 41–4–12 waives sovereign immunity. We, therefore, remand this case for further proceedings.

■ *Plaintiff has not alleged a violation of a right secured under the federal constitution.* In a separate count under 42 U.S.C. Section 1983, plaintiff alleges that the policy of nonenforcement adopted by defendants deprived the McKeen family of rights secured under the federal constitution. The court of appeals determined that plaintiff's claim in this regard was precluded under *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). We agree.

In *DeShaney*, the plaintiff was a four-year-old boy named Joshua, who had been beaten so severely by his father that it was thought he would spend the rest of his life in an institution for the profoundly retarded. Prior to this incident, the county social workers of the State Department of Social Services had returned Joshua to the custody of his father and had entered into an agreement with the father intended to protect Joshua from further abuse. Despite the agreement, evidence of abuse continued to reach social workers assigned to the case. The record contained a remark by one social worker that "I just knew the phone would ring some day and Joshua

would be dead." *Id.* at 209, 109 S.Ct. at 1010.

The Supreme Court held, however, that the substantive component of the due process clause of the fourteenth amendment that protects one's liberty interest in bodily integrity did not protect Joshua from violence by a private party. Unlike cases in which the state had taken a person into custody and assumed responsibility for that person's well being, here "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." *Id.* at 201, 109 S.Ct. at 1006. Moreover, the Court reasoned:

> But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.* at 195, 109 S.Ct. at 1003.

Plaintiff seeks to avoid the reach of *DeShaney* by contending that defendants here consciously articulated a policy of nonenforcement that was the "driving force" behind the deprivation of interests protected under the federal constitution. We are not convinced that the role of defendants in this case "rendered [McKeens] more vulnerable" to harm from intoxicated drivers *to a greater extent* than the combination of action and inaction of state employees had rendered Joshua DeShaney susceptible to harm from his father. Moreover, we agree with the court of appeals that the *DeShaney* opinion turns on a lack of duty to protect a citizen from dangers created by private actors, not on whether the state's conduct was the result of a consciously articulated policy. *See id.* at 202 n. 10, 109 S.Ct. at 1007 n. 10.

Plaintiff seeks support for its interpretation of *DeShaney* from the opinion of the federal court of appeals in *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720 (3d Cir.1989), *cert. denied sub nom., Smith v. Stoneking,* —— U.S. ——, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). Although *Stoneking* finds a cause of action based on "policies maintained in deliberate indifference to actions taken by their subordinates," *id.* at 725, the individual who was alleged to have sexually molested the plaintiff over a number of years was an employee of the school district. "Unlike DeShaney's father, who was referred to throughout the *DeShaney* opinion as a private third party, Wright was a school district employee subject to defendant's immediate control." *Id.* at 724. Here, as in *DeShaney*, the injury to the McKeen family was effected by a private party. We conclude that plaintiff has failed to state a deprivation of a federally secured right.

*Question of violation of right secured under the New Mexico Constitution not reached.* Finally, plaintiff argues that the conduct alleged in the complaint establishes a violation by defendants of rights secured under Article II, Section 4 of the New Mexico Constitution. Section 4 provides:

> All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness.

Defendants argue that this Section parallels the language of the due process clause of the fourteenth amendment and should be given the same breadth under these facts as the Supreme Court gave to the federal constitution in *DeShaney*. We find this argument unpersuasive. The *DeShaney* Court emphasized that "nothing in the language of the Due Process Clause itself requires the State to protect * * * its citizens against [injury] by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." 489 U.S. at 195, 109 S.Ct. at 1003.

Unlike the language of the fourteenth amendment, however, Article II, Section 4 expressly guarantees the right "of seeking and obtaining safety * * * *" *Cf.* N.M. Const. art. II, § 18. In interpreting the more expansive language of Article II, Section 4, we are mindful of the more intimate relationship existing between a state government and its people, as well as the more expansive role states traditionally have played in keeping and maintaining the peace within their borders. *Cf. Monell v. Department of Social Servs.*, 436 U.S. 658, 673, 98 S.Ct. 2018, 2026–27, 56 L.Ed.2d 611 (1978) (discussing legislative history behind rejection of "Sherman Amendment" to the Civil Rights Act of 1871 based on belief of congressional opponents that federal government constitutionally could not require local governments to create police forces to provide protection to its citizens).

Although the language of Article II, Section 4 militates against a conclusion that *DeShaney* is controlling authority on this subject, we do not reach the issue of whether, and under what circumstances, violation of its provisions gives rise to a cause of action for damages under the provisions of the Tort Claims Act. Plaintiff has raised this claim only as it relates to the primary liability of the defendants, not in terms of whether the actions of the sheriff's deputies amounted to a constitutional tort. As we already have concluded that defendants are immune from suit based on their primary liability, we do not address this issue further.

*Conclusion.* We conclude that plaintiff's complaint states a cause of action for personal injury based on the vicarious liability of the County for negligence of sheriff's deputies alleged to have proximately caused the deprivation of a right secured under New Mexico law. We remand this case for further proceedings consistent with this opinion.

IT IS SO ORDERED.

SOSA, C.J., and BACA, J., concur.